IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ANNETT LYNN HERRON,

          Plaintiff,

      v.                                 Civil Action No. 5:12-CV-44

MICHAEL ASTRUE,
Commissioner of Social Security,

          Defendant.

**REPORT AND RECOMMENDATION
THAT MS. HERRON'S MOTION FOR SUMMARY JUDGMENT BE GRANTED AND
COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT BE DENIED**

## I. INTRODUCTION

### A.     Background

       Plaintiff, Annett Lynn Herron, filed her Complaint on March 21, 2012, seeking judicial

review pursuant to 1383(c)(3), which incorporates the judicial review enunciated in 42 U.S.C. §

405(g), of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[1]

Commissioner filed his Answer on June 6, 2012.[2]  Ms. Herron filed her Motion for Summary

Judgment on July 5, 2012.[3]  Commissioner filed his Motion for Summary Judgment on July 30,

2012.[4]  Finally, Ms. Herron filed a response to the Commissioner's Motion on August 13, 2012.[5]

---

[1] Dkt. No. 1.

[2] Dkt. No. 7.

[3] Dkt. No. 10.

[4] Dkt. No. 12.

[5] Dkt. No. 14.

**B.** **The Pleadings**

1. Ms. Herron's Motion for Summary Judgment & Memorandum in Support

2. Commissioner's Motion for Summary Judgment & Memorandum in Support

3. Ms. Herron's Response to Commissioner's Motion

**C.** **Recommendation**

I recommend that:

1. Ms. Herron's Motion for Summary Judgment be **GRANTED** and the case be **REMANDED** for a determination of benefits because the Administrative Law Judge ("ALJ") did not properly consider listing 12.05(C), and his decision to deny benefits was not based upon substantial evidence.

2. Commissioner's Motion for Summary Judgment be **DENIED** for the same reasons set forth above.

## II. FACTS

**A.** **Procedural History**

Ms. Herron filed an application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f), on September 24, 2009, alleging disability as of August 7, 2009 due to neck problems, leg pain, acid reflux, and glaucoma. (R. 145-48, 178-79.) The application was initially denied on December 17, 2009, and on reconsideration on March 31, 2010. (R. 81-82.) On May 6, 2010, Ms. Herron requested a hearing by an Administrative Law Judge (ALJ) (R. 99-101.)

On July 25, 2011, ALJ George A. Mills held a hearing at which Ms. Herron and a vocational expert (VE), Dr. Larry Contosh, appeared and testified. On August 9, 2011, the ALJ found that the

plaintiff was not disabled because she did not meet any listing and "there are jobs that exist in significant numbers in the national economy that Ms. Herron can perform." (R. 31.) Ms. Herron requested review by the Appeals Council but was denied. (R. 1-5.) Ms. Herron filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

**B.      Personal History**

Ms. Herron was born on June 22, 1966, and was forty-five years old on the date of the July 25, 2011 hearing before the ALJ. (R. 32.) Ms. Herron completed school through the eleventh grade, most of which was spent in special education classes. (R. 48-49.) She dropped out of high school when she became pregnant at seventeen years of age, and has not obtained any form of diploma. (R. 44.)  Ms. Herron has a very limited work history, briefly working as an in-home caretaker for an elderly individual, and as a housekeeper.  Each employment lasted only a few days. (R. 49-50.)

**C.      Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Ms. Herron is not under a disability and can still perform work in the national economy:

1. Physical Health

In December 2004, Ms. Herron was involved in a single vehicle rollover car accident and was taken to the St. Joseph's Hospital emergency room.   Dr. Chafin performed multiple examinations on Ms. Herron, including a Chest PA that revealed the mediastinal structures and heart size to be within normal limits, and no acute pulmonary process.   Moreover, the examination showed radiodense material projecting at the proximal right arm and overlying the heart, probably extraneous to the patient versus foreign body within the soft tissues. (R. 352.) Further examination

showed that the spine was in normal alignment, and a tiny osseous density anterior to the inferior endplate of C5, which appeared to be chronic. A CT Scan of the head revealed a mildly displaced fracture of the C2 vertebrae. (R. 353-54.)

In June of 2006, after a trip to the emergency room two months earlier, Ms. Herron was referred for consultation with a specialist because of a frequent sore throat, abdominal pain, and bloating. At that visit, a review of her systems came back positive for fever, double vision, sinus problems, sore throat, dental problems, chronic cough, nausea and vomiting, rash, dizziness, and numbness.(R. 327.) Ms. Herron was taking Omeprazole, Nasarel, and Keflex at the time of the appointment. (*Id*.) Dr. Long proceeded to perform an upper and lower endoscopy, (R. 328-33), which showed that the first and second portions of the duodenum were well visualized and normal, and that there was no evidence of hiatal hernia. (R. 332.) During the withdrawal of the scope into the esophagus, the doctor noted mild evidence of gastroesophageal reflux disease. (*Id*.) No abnormalities were noted in the colon. (*Id*.)

On April 8, 2009, Ms. Herron appeared for her annual well woman exam at Tri County Health Clinic, but she also complained of recent chest pain. (R. 234-35.) On August 24, 2009, Ms. Herron again went to Tri County with complaints of neck pain, dizziness, and left thenar and wrist numbness. (R. 242-43.) An MRI of her neck was ordered, but it did not show any abnormalities. (R. 243-45.) Ms. Herron was again seen for complaints of neck pain and dizziness on February 23, 2010, (R. 288-89.), and on June 14, 2010. (R. 300-02.) On September 27, 2010 Ms. Herron was noted to have chest pain with positive EKG changes and elevated blood pressure. (R. 306.) Ms. Herron complained of neck pain "8/10 at most" on April 11, 2011. (R. 311.) Finally, on May 12, 2011, Ms. Herron was diagnosed with iron deficient anemia. (R. 315.)

A physical examination was performed by Dr. Arturo Sabio in November 2009 at the request of Disability Determination Services. (R. 274-78.) That examination reinforced the myopia diagnosed by Dr. Abel, discussed below, and that she should be wearing prescription glasses which she cannot afford. (R. 278.) Dr. Sabio also found arthritis at the cervical spine due to the car accident in 2004, and found that the Ms. Herron had bilateral vericose veins, for which he recommended treatment to control the pain. (*Id*.) Finally, a physical RFC was done by Dr. Narendra Parikshak in December 2009. (R. 279-86.) Dr. Parikshak found no established physical limitations, and found the symptoms alleged by Ms. Herron to be "not fully credible." (R. 284.) The RFC was affirmed as written in March 2010, by Dr. Rafael Gomez. (R. 291.)

2. Eye Health

After an eye examination in October 2008 with Strout & Kress Eyecare, Ms. Herron was seen for a consultative examination which measured her eyesight at 20/50 in each eye. (R. 229-30.) A later report from Burton Abel, OD, in July 2011, is more informative. (R. 381.) The doctor measured Ms. Herron's eyesight as 20/80 in each eye, and classified it as moderate vision impairment or moderate low vision which has decreased over time. Moreover, Ms. Herron exhibited retinal findings consistent with progressive myopia, and her macula showed signs of pigment disturbances and retinal thinning, which can be visually debilitating. (*Id*.)

3. Mental Health

On November 28, 2005, Ms. Herron was sent by the West Virginia Disability Determination Service (with regards to her first filing for disability benefits) to see Morgan D. Morgan, M.A. (R. 382.) Mr. Morgan completed multiple assessments of Ms. Herron, including a Wechsler Adult Intelligence Scale Test, Third Edition (WAIS-III); a Wide Range Achievement Test-3 (WRAT-3);

a mental status examination; and a clinical interview. (*Id*.) During the assessments, Mr. Morgan noted that she was cooperative and compliant, although often self-conscious and hesitant. (*Id*.)

For the WAIS-III, Mr. Morgan measured Ms. Herron's verbal IQ at 67, performance IQ at 70, and full scale IQ at 66. (R. 385.) However, Mr. Morgan had some hesitation about the validity of these results, finding them to be an

> [u]nderestimate of the client's true intellectual functioning. The results of today's assessment displayed several inconsistencies, and the client was often very self-conscious and would not hazard responses. The client's presentation during this assessment and comprehension of our communications suggest that she may well function within the borderline intellectual functioning range of intelligence. This seemed more commensurate with her stated level of adaptive functioning.

(*Id*.) Mr. Morgan went on to qualify his diagnosis of borderline intellectual functioning as provisional. (R. 386.) The WRAT-3 test administered by Mr. Morgan placed Ms. Herron in the third to fourth grade range in reading, spelling, and arithmetic, which Mr. Morgan deemed to be a fair estimate of the Ms. Herron's academic abilities.

Mr. Morgan's mental status examination reported Ms. Herron as having normal comprehension and verbal responses; proper orientation to time, name, place, and date; displaying a happy mood with a broad range of affect; and no symptoms of psychosis. (R. 384.) Moreover, there were no reported mood difficulties, crying spells or suicidal ideation, and Ms. Herron reported normal sleep patterns. Ms. Herron's insights, however, were deemed to be moderately deficient, (*Id*.), and Mr. Morgan determined that Ms. Herron was mildly deficient in persistence, pace, and immediate memory. Finally, Mr. Morgan details Ms. Herron's daily activities and social functions, which appear to be consistent with that of a homemaker. His diagnostic impression were:

Axis I:        No diagnosis;

| Axis II:  | Borderline intellectual functioning (provisional); and |
|-----------|---------------------------------------------------------|
| Axis III: | Reported history of neck fracture, daily neck pain, sinus condition related to injury, and seasonal allergies. |

(R. 386.)

In March of 2008, Ms. Herron was again sent by the West Virginia Disability Determination Service to see a psychologist, Dr. Thomas Stein. (R. 388-93.) Dr. Stein performed the same assessments that his predecessor Mr. Morgan performed, and those results follow. According to Dr. Stein, Ms. Herron arrived neatly dressed and clean, but his initial observation was that Ms. Herron was of below average intelligence. (R. 388.) Ms. Herron's chief complaints were that she suffered from a lot of neck and leg pain, and that she was a slow learner, which affected her ability to read. (R. 388-89.) The test results for the WAIS-III returned a verbal IQ of 66, performance IQ of 73, and a full scale IQ of 66. (R. 391.) Dr. Stein identified no factors that would cause him to question the validity of the results. (*Id*.) The results of the WRAT-3 placed Ms. Herron in the third to fourth grade ability in reading, spelling, and arithmetic, and again the doctor had no questions as to the validity of the results. (*Id*.)

Although the WAIS-III and WRAT-3 produced similar results to the tests performed by Mr. Morgan, the clinical interview is markedly different. According to Dr. Stein, Ms. Herron presented as depressed, with eating and sleeping disturbances, and frequent crying episodes. Moreover, Ms. Herron reported suicidal ideation in the past and more recently, and posed a mild risk for suicide. (*Id*.) The doctor's diagnoses were:

| Axis I: | Learning disability, NOS; Post Traumatic Stress Disorder, chronic-type, moderate symptoms; Major Depression, single episode, non-psychotic; Pain Disorder association with a general medical condition |
|---------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

and psychological factors.

Axis II:          Borderline intellectual functioning

Axis III:         Gastroesophageal reflux disease; chronic neck pain;
                  chronic leg pains, bilaterally

Ms. Herron was again seen by Dr. Stein on November 18, 2009, when the doctor performed another mental status examination. (R. 249-53.) The doctor noted, as last time, that she was neatly dressed, clean, cooperative, and polite. (R. 249.) Ms. Herron's chief complaint was neck and shoulder pain, lightheadedness, and pain in her ovaries. (*Id*.) As in the last visit with Dr. Stein, Ms. Herron presented with sleep and eating disturbances, depression, and a mild risk for suicide. (R. 250.) His diagnoses were:

Axis I:           Adjustment disorder with mixed emotional
                  features; pain disorder associated with general
                  medical condition and psychological factors.

Axis II:          No Diagnosis

Axis III:         Hypercholesterolemia, chronic shoulder and neck
                  pains with episodic back pain, chronic pain from an
                  ovarian tumor, and gastroesophageal reflux disease.

(R. 252.) All other findings mimic the first report of Dr. Stein.

A few days after Dr. Stein's evaluation, a mental RFC was conducted by Dr. Joseph Kuzniar. (R. 254-57.) Dr. Kuzniar found some moderate limitations, but that the Ms. Herron "retains the capacity to carry out lower level routine instructions within a low social interaction demand within a low pressure work setting." (R. 256.) Dr. Kuzniar's findings were affirmed as written on March 31, 2010, by Dr. David Allen. (R. 292.)

The final installment in Ms. Herron's mental health diagnoses came on December 13, 2011, when she was referred by her attorney, Travis Miller, to see Dr. Tony Goudy for intelligence testing.

(R. 394-95.) Dr. Goudy measured Ms. Herron's full scale IQ at 68, using the WAIS-IV, and stated "with a high degree of certainty that the present results reflect [Ms. Herron's] current level of intellectual functioning." (R. 395.) The doctor concluded about the validity of the results, taking into consideration the previous results from Dr. Stein and Mr. Morgan, that he "would find it absurd to contend that someone with [Ms. Herron's] background could malinger so consistently at three-year intervals."

The 2008 report by Dr. Stein and the 2011 report by Dr. Goudy were not before the ALJ when he made his decision. These reports were, however, supplemented as evidence before the Appeals Council.

**D.     Testimonial Evidence**

Testimony was taken at the hearing held on July 25, 2011. The following portions of the testimony are relevant to the disposition of the case:

Ms. Herron testified that she "can't see up close and [she] can't see really far, far away," and that she is "always lightheaded, like blurred vision." (R. 47.) About her corrective lenses, Ms. Herron said she "just got these, and [she] had to go back today or tomorrow and he has to put another set in. These ain't good enough." (*Id*.) She also complained about the trip to the hearing, saying "my back and my neck. Long trips, it's hard to do in it." (R. 48.)

Regarding her education Ms. Herron said she "went to the 11th [grade] and was going to the 12th," and that she "can read some, but not a lot." (*Id*.) She said she "can write little [notes]," and "add and subtract, but when it comes to like multiplying and divisions, I can't do it." (R. 48-49.) She testified that she was in some special education classes in middle school, "but when [she] went to high school, it was all day." (R. 49.)

Ms. Herron testified that she is not employed and that she had only two work experiences "somewhere in the 90s," one taking care of an older person and the other as a housekeeper at a motel. (R. 49-50.) Each job lasted "two or three days." (R. 50); although she told Dr. Stein that the former job lasted from age sixteen to age seventeen. (R. 250.) She claimed that the reason she did not work was that "[her husband] said [she] needed to stay home and take care of the kids."

When questioned about her medical issues, Ms. Herron noted the pain in her neck and back, and that she takes blood pressure medication and iron pills for her anemia. (R. 53.) She also claimed to have stopped drinking, "probably about five or six years ago." (R. 54.) Ms. Herron described headaches that she has been getting (and that she takes Tramadol for), and that she gets "real lightheaded. [She] can't stay in the sun very long." (R. 57.) Because of her claimed limitations, Ms. Herron does not do much work outside the house. (*Id.*)

At the hearing, the ALJ gave the following profile to the vocational expert (VE):

> The profile of Ms. Herron is 43 to 45. She has a limited education, 9th grade–or 11th grade, I'm sorry. And no past work. The prior Administrative Law Judge indicated a limitation to a medium exertional level of work activity. Only occasionally climb, balance stoop, kneel, crouch and crawl. No overhead lifting with the bilateral upper extremities, no sharp visual acuity. Limited to only simple, routine work with limitations in quote-type activity and limitations in dealing with the public. At the medium exertional level of work, would there be jobs that you could identify one or two examples at the medium level?

The VE responded:

> There are jobs that meet the conditions that you've set. A kitchen helper; 156,000 nationally; 5,000 regionally. A storage laborer; 210,000 nationally; 1,500 regionally. In my experience, these rely primarily on gross motor hand movement versus fine finger dexterity.

At the hearing, the ALJ also posed the following hypothetical to the VE:

At the light exertional level of work, light is lifting only 20 pounds occasionally, 10 pounds frequently with the ability to stand and walk six to eight hours a day, sit six to eight hours a day with normal breaks, but no climbing of any ladders, ropes or scaffolding. Only occasionally use a ramp or a stairway, balance, stoop, kneel, crouch and crawl. Again, limited to no overhead reaching or lifting, for that matter, bilaterally with both upper extremities. And as far as visual . . . according to Dr. Able, 20/80 in each eye with correction based upon a diagnosis of myopia. So, glasses are required in the job. And avoid concentrated exposure to temperature extremes, that would be heat and cold. So, essentially, a controlled environment, as far as temperature. Avoid concentrated exposure to vibration and concentrated exposure to hazards. By hazards, I mean moving plant machinery and unprotected heights. And to avoid the driving of vehicles as part of the employment consideration. No operation of motor vehicles or in employment activity.

The work must be unskilled, only occasional contact with supervisors and co-workers. No public contact. And no rapid production quotas. Dr. Contash, I will ask you then, essentially, would there be any job or jobs that could be performed in the national, regional economy; the region to be defined by you that an individual could perform, taking into consideration the limitations an disabilities described in the second hypothetical.

(R. 60-61.)

The VE then responded that:

The region I'll use is all of West Virginia, eastern Ohio, western Pennsylvania, and western Maryland. Occupations, which meet the conditions in the second hypothetical include a house cleaner at light and unskilled; 364,000 nationally; 6,000 regionally. A garment folder, also light and unskilled. 125,000 nationally, 600 regionally. A garment hand washer; 400,000 nationally; 8,000 regionally. These again are occupations that primarily use gross motor movement, though, not exclusively so.

(R.61.)

The ALJ then changed the exertional level required in the following hypo:

If we change the exertional level to sedentary, sedentary is lifting only 10 pounds occasional, 5 pounds or less on frequent basis,

> standing and walking is reduced to two hours out of an eight-hour
> workday. Sitting is primarily the exertional requirement for
> sedentary, sit six to eight hours a day. Now, the other limitations and
> restrictions that you previously considered at light would be
> appropriate in this sedentary hypothetical. With those gross motor
> movements, would it preclude sedentary work or in your opinion?

(*Id.*) The VE responded that: "In combination with other things, sedentary work, in my opinion,

preclude a customary sedentary work is assembly, and there's a restriction on quotas. Clerical work

I think is impacted negatively by special education. Sedentary work also more relies on fine finger

dexterity, writing, keyboard utilization." (R. 62.) The ALJ then added one final question:

> Assume that I find the testimony of Ms. Herron to be credible and
> good and supported by the medical evidence, and as a result of the
> medical evidence and the residual that she is experiencing, not only
> from her neck, but from her vision and her nerves, that the ability to
> maintain a sufficient level of concentration and pace would be in the
> category of marked, resulting in or defined as off task a third of an
> eight-hour workday or longer. There would be bad days where she
> would be absent from work more than two times, perhaps as many as
> four or more in a 30-day period. If that would be the case, would
> there be any jobs that you could identify?

(R. 62.) The VE responded: "No, sir." (*Id.*) The representative for the Ms. Herron then asked the VE

if there was any visual requirement for the jobs that he described in response to the ALJ's queries.

The VE responded:

> You have to be able to see. Without special training–well, let me say
> it differently. With special training a blind person can learn to do a
> gross motor movement job. It does require special training. The
> Dictionary does not classify jobs by visual acuity.

(R. 63.) The representative then asked the VE to "[a]ssume that this person's production–overall

production level would be decreased by a quarter, would they be able to perform any work? If they

had–everyday, they had a–you know, they were not able to keep up at least 25 percent of the day?"

(R. 63.) The VE responded in the negative, saying that "[c]ustomary tolerance for that is 10

percent." (*Id*.)

**E.      Lifestyle Evidence**

The following evidence concerning the Ms. Herron's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Ms. Herron's alleged impairments affect her daily life.

During her childhood, Ms. Herron was subject to the abusive relationship of her parents. She was in an abusive marriage of her own that lasted for twenty-four years and ended in divorce. (R. 251.) She is the mother of two grown children, and has three grandchildren, none of which live with her. (R. 45-46.)  She currently lives with a friend that she has stayed with for the past seven years. (R. 25.) During the course of a typical day, Ms. Herron cooks and cleans, takes care of the animals, and does the grocery shopping.

In her clinical interview with Dr. Stein, Ms. Herron admitted to drinking heavily in her twenties and thirties when she would consume a twelve-pack of beer daily. (R. 250.) She was arrested in 2004 for driving under the influence of alcohol.  (R. 54.) The result of that episode was the car accident that fractured her C2 vertebrae. (*Id*.)  However, she now claims to be sober, and has been for four to five years.

### III.  THE MOTIONS FOR SUMMARY JUDGMENT

**A.      Contentions of the Parties**

Ms. Herron's brief alleges that the ALJ failed to properly consider listing 12.05(C) because she presented evidence of valid IQ scores between 60 and 70, and had a second impairment imposing significant work related limitations.

Commissioner contends the ALJ's decision is supported by substantial evidence and should

therefore be affirmed.  Specifically, Commissioner responds that the ALJ properly considered all relevant listings and correctly concluded that Ms. Herron's mental impairment did not meet the required criteria for listing 12.05(C).

## B.    The Standards

### 1. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v.  Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### 2. Judicial Review

Only a final determination of the Commissioner may receive judicial review.  *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131,133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is that which a "'reasonable mind might accept as adequate to support a conclusion.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). Further, the "'possibility

of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Sec'y of Labor v. Mutual Mining, Inc.*, 80 F.3d 110, 113 (4th Cir. 1996) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966)).

3. Social Security - Medically Determinable Impairment - Burden.

Ms. Herron bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

## C.     DISCUSSION

1. Whether the ALJ Erred by Not Fully Considering Listing 12.05(C)

A claimant is determined to be disabled and entitled to disability benefits when her impairment meets or equals a listed impairment in Appendix 1 of the Secretary's regulations. 20 C.F.R. § 404.1520(d); *see also Turner v. Bowen*, 856 F.2d 695, 698 (4th Cir 1988). The central issue on appeal is whether there was substantial evidence to support the Secretary's finding that Ms. Herron did not meet the listed impairment for mental retardation in 12.05(C). With regard to that listing, the ALJ proffered the following determination:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(R. 24.) Listing 12.05(C) provides:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially

manifested during the developmental periods (before age 22.) . . . The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . . .

C. A valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function. . . .

20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05. Thus, to meet the requirements of subsection C, Ms. Herron must show three things: (1) deficits in adaptive functioning before age twenty-two; (2) a valid verbal, performance, or full scale IQ of 60 to 69; and (3) a physical or other mental impairment imposing additional and significant work-related limitation of function. I will consider each requirement in turn.

*a. Deficits in Adaptive Functioning Before Age Twenty-Two*

Because mental retardation is a lifelong condition, a claimant must show that the condition predates age twenty-two. *Luckey v. U.S. Dept. of Health and Human Svcs*, 890 F.2d 666, 668 (4th Cir. 1989). Factors used to determine whether deficits in adaptive function exist include "limitations in areas such as communication, self care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 Fed. Appx. 214, 218 (4th Cir. 2012)(citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002).

There is no evidence in the record that contradicts a finding that Ms. Herron had deficits in adaptive functioning prior to her twenty-second birthday. Quite contrary, the ALJ reviewed the report of Mr. Morgan, which indicated that Ms. Herron received "special education services throughout her academic career," received Cs, Ds, and Fs, and did not graduate from high school.

(R. 383.) Moreover, Ms. Herron testified to the ALJ that she was in special education classes in school, has a limited ability to read and write, and cannot do simple division or multiplication, (R. 48-49.), all of which are substantiated by all the intelligence testing that places her on an elementary school level.

Other district courts in this circuit have found that a claimant's illiteracy, failure to graduate from high school, enrollment in special education classes, and poor grades, are all important when reviewing whether a claimant has deficits in adaptive functioning in academic skills. *See e.g. Wiggins v. Astrue*, 5:11-cv-85, 2012 U.S. Dist. LEXIS 39022 (E.D.N.C., Mar. 22, 2012); *Holtslaw v. Astrue*, 1:10-cv-199, 2011 WL 6935499 (W.D.N.C. Dec. 30, 2011); *Catron v. Astrue*, 2:08-cv-43, 2009 U.S. Dist. LEXIS 67096 (W.D.Va. Aug. 1, 2009). Ms. Herron satisfies all of these elements.

In addition to the educational deficits, Ms. Herron has practically no work history and is deficient in social functioning. Dr. Stein's March 3, 3008 report finds:

> SOCIAL FUNCTIONING: She is cooperative, polite, subdued, below average intelligence, functionally illiterate, and depressed. She occasionally attends church. She does not date and does not hold membership in clubs or go to meetings. She rarely goes to restaurants. She regularly visits with her mother. She occasionally socializes with friends. This claimant is mildly deficient in the social functioning arena.

(R. 393.) Thus, Ms. Herron has shown limitations in nearly every category used to determine deficits in adaptive functioning, and based on her educational history these limitations manifested prior to her turning twenty-two years old.

The Appeals Council based its denial of review on this factor, finding that Ms. Herron's "activities of daily living fail to support that [she] has these deficits in adaptive functioning." The only evidence in the record is that Ms. Herron remains at home doing small chores, and that she can

do the grocery shopping. This is hardly substantial evidence that Ms. Herron's deficits in mental functioning did not predate her twenty-second birthday. In fact, Ms. Herron satisfies all of the criteria thus mentioned. The ALJ did not discuss deficits in adaptive functioning in his ruling.

### b. Valid IQ Score

The only IQ evidence considered by the ALJ in Ms. Herron's case was the report by Mr. Morgan. Mr. Morgan provided a report that measured Ms. Herron's full scale IQ at 66, but deemed the scores invalid because of some inconsistencies in Ms. Herron's behavior. The ALJ did adopt Mr. Morgan's diagnosis of borderline intellectual functioning.

Mr. Morgan's testing was not the only IQ testing done, however, as Dr. Stein conducted the same tests on March 3, 2008–twenty months prior to the clinical examination that Dr. Stein performed. That testing, as noted above in the medical evidence section, gives the same exact measure of full scale IQ at 66 with a reading and writing level hovering around the third to fourth grade, and Dr. Stein "identified no factors that would cause [him] to question the validity of the obtained results." Dr. Stein's report was not before the ALJ; rather, it was submitted as supplemental evidence to the Appeals Council.

A final IQ test was administered to Ms. Herron at the behest of her attorney, and after the ALJ's denial of her application for benefits. That test, given by Dr. Goudy, resulted in a full scale IQ of 67. In looking at the previous results, Dr. Goudy noted "remarkable consistency among all three sets of test results," and that he "would find it absurd to contend that someone with Ms. Herron's background could malinger so consistently at three-year intervals." (R. 395.) Dr. Goudy's report was also not before the ALJ, but it, too, was submitted to the Appeals Council.

Although the March 2008 and December 2011 tests were not in front of the ALJ, those tests

were adopted by the Appeals Council and made part of the record before this Court. (R. 1-2.) *See e.g. Brewes v. Comm'r of SSA*, 682 F.3d 1157, 1159-60 (9th Cir. 2012)("We hold that when a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence."). Thus, I find that a valid IQ score between 60 and 70 existed in Ms. Herron's case.

### c. Additional Physical or Mental Limitation

This additional limitation "need not be disabling in and of itself . . . [the] inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions," *Luckey,* 890 F.2d at 668. Moreover, the Secretary has defined "a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities," and a finding that "[Claimant] suffers from a severe combination of impairments also establishe[s] the second prong of section 12.05(C). *Id*. at 669 (citing 20 C.F.R. §§ 404.1520(c), 1520(a) (1988)).

In Ms. Herron's case, the ALJ found several severe impairments, including "degenerative arthritis, cervical spine, status post fracture of second cervical vertebrae; stable hypertension; bilateral myopia; adjustment disorder with mixed emotional features; borderline intellectual functioning; pain disorder associated with her general medical condition and psychological factors; and a history of alcohol abuse in partial remission." (R. 22.) Thus, according to the Secretary's definition and established law, these severe impairments conclusively establish that the "additional

limitation" requirement of 12.05(C) is met.[6]

**D.      CONCLUSION**

In sum, I find that Ms. Herron's lowest score on the WAIS was a full scale IQ of sixty-six, which falls well within the sixty to sixty-nine range provided in § 12.05(C). Moreover, there is evidence to support that the disability manifested prior to her turning twenty-two years old. Finally, the uncontroverted medical evidence supports Ms. Herron's claim that her physical impairments impose an "additional and significant work-related limitation of function." In fact, the ALJ specifically found that Ms. Herron had several severe impairments that would limit her to light work. This conclusion alone is more than the one sentence offered by the ALJ in his finding that Ms. Herron did not meet 12.05(C). Therefore, the ALJ's decision could not have been based on substantial evidence and it cannot stand.

## IV.  RECOMMENDATION

For the foregoing reasons, I recommend that:

1.      Ms. Herron's Motion for Summary Judgment be **GRANTED** and the case be **REMANDED** for a determination of benefits because the ALJ's decision that Ms. Herron does not meet listing 12.05(C) was not based upon substantial evidence.

2.      Commissioner's Motion for Summary Judgment be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the

---

[6] The Commissioner even concedes as much in his memorandum in support of summary judgment. Dkt. No. 13 ("The Commissioner agrees that, had Plaintiff met the first prong of the listing by means of valid IQ scores within the specified range, her other impairments, which the ALJ found to be severe would most likely have met the second prong of the listing.")(citations omitted).

Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 24, 2012

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE